# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ODOM INDUSTRIES, INC.,                           Case No. 1:12-cv-309

      Plaintiff,

                                     Judge Timothy S. Black

      vs.

DIVERSIFIED METAL PRODUCTS, INC. *et al.*,

      Defendants.

## ORDER THAT: (1) DEFENDANT DMP'S MOTION TO DISMISS OR IN THE ALTERNATIVE TO TRANSFER VENUE (Doc. 6) IS DENIED; and (2) DEFENDANT DMP'S MOTIONS TO STRIKE (Docs. 30, 31) ARE DENIED

This civil action is before the Court on Defendant Diversified Metal Products'[1]

motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) or

in the alternative to transfer venue (Doc. 6), and the parties'[2] responsive memoranda

(Docs. 24, 25, 28).  Also before the Court are Defendant DMP's motions to strike (Docs.

30, 31) and the parties' responsive memoranda (Docs. 32, 33).

## I.  BACKGROUND FACTS <u>AS ALLEGED BY PLAINTIFF</u>

### A.  Odom's Business And Location

Odom is a custom steel fabrication company, and its sole shop and office are

---

[1]  Diversified Metal Products, Inc. ("DMP") is an Idaho corporation with its principal place of business in Idaho Falls, Idaho.  (Doc. 6, Ex. 1 at ¶ 4).  DMP's only office (and only manufacturing facility) is located in Idaho Falls.  (*Id.* at ¶¶ 4-5).

[2]  Plaintiff Odom Industries, Inc. ("Odom") file a memorandum in opposition.  Defendant Team Industrial Services, Inc. ("TISI") also filed a memorandum in opposition to notify the Court that it supported Plaintiff's position that Defendant DMP is subject to personal jurisdiction in this Court.  (Doc. 24).  Additionally, TISI opposes DMP's request to transfer venue.  (*Id.*)

located in Milford, Ohio.  (Doc. 25, Ex. 2 at ¶ 2).  Odom does not maintain an office in

any other state.  (*Id.*, Ex. 3 at ¶ 52).  Therefore, all communications and documents

transmitted by DMP to Odom, referenced below, were done through contact by DMP

with Odom's office in Ohio, and all fabrication completed by Odom at DMP's request,

also referenced below, was at Odom's shop in Ohio.  (*Id.*, Ex. 2 at ¶ 2; Ex. 3 at ¶ 2).

One line of Odom's business is the fabrication of ASME ("American Society of

Mechanical Engineers") heads.  (Doc. 25, Ex. 3 at ¶ 3).  Projects subject to the ASME

Code must adhere to very strict quality assurance and quality control requirements.  This

action arises from a dispute between Odom and DMP regarding Odom's fabrication of

two ASME Semi-Ellipsoidal Heads for DMP (the "Heads" or the "Project"), and DMP's

alleged conversion of Odom's property and misrepresentations concerning the same.

**B.  DMP Has Continuously Reached Out To Odom In Ohio To Conduct
    Business With It**

Since 2007, DMP has repeatedly reached out to Odom in Ohio to solicit quotes and

revised quotes from Odom.  (Doc. 25, Ex. 2 at ¶ 3).  It was DMP that initially reached

into Ohio and initiated contact with Odom to solicit a quote from Odom, and it was DMP

that continued to reach into Ohio to solicit quotes for additional projects from Odom.

(*Id.*)  Since 2007, DMP has contacted Odom in Ohio and requested that Odom provide

quotes and revised quotes for at least 8 projects.  Three of these projects resulted in DMP

issuing Purchase Orders to Odom in Ohio (one of which is at issue in this litigation).

There have been countless communications (including, but not limited to, via telephone

calls, conference calls, emails, and facsimiles) between DMP and Odom since 2007 regarding these projects and proposed projects. (Doc. 25, Ex. 2 at ¶¶ 4-5; Ex. 3 at ¶¶ 4-5).

### A. DMP's Initial Solicitation Of Odom And Issuance Of Purchase Order # 36631

In late 2007, DMP first initiated contact with Odom in Ohio. At that time, DMP reached out to Odom and requested that it submit a proposal for the fabrication of one Semi-Head with a 76" outside diameter. (Doc. 25, Ex. 2 at ¶ 6). Odom's sales representative had several discussions with DMP representatives regarding the project, including negotiations over the terms upon which it would complete the work. (*Id.* at ¶ 7).

On December 19, 2007, Odom submitted a proposal for the 76" Semi-Head to DMP in accordance with DMP's request. Odom's proposal provided that it would fabricate the Semi-Head, but excluded shipping and instead placed responsibility for shipping the 76" Semi-Head from Milford, Ohio, upon DMP. (Doc. 25, Ex. 2 at ¶ 8). On December 20, 2007, DMP issued Purchase Order No. 36631 via facsimile to Odom's office in Ohio, which contained DMP's proposed terms of its contractual arrangement with Odom for the project. The amount of the Purchase Order was $26,407. (*Id.* at ¶ 9). Odom thereafter accepted DMP's Purchase Order. (*Id.* at ¶ 10).

DMP Purchase Order No. 36631 created continuing obligations between the parties. It required Odom to custom fabricate the 76" Semi-Head in its shop located in Milford, Ohio over the following two months so that it was complete and ready to ship by February 22, 2008. In exchange, DMP was obligated to pay Odom the Purchase Order

price in two separate payments.  (Doc. 25, Ex. 2 at ¶ 11).   DMP or an agent or vendor of

DMP was responsible for traveling to Odom's shop in Ohio to pick-up the completed 76"

Semi-Head and ship it from Ohio to its final destination.  (*Id.*, Ex. 2 at ¶ 12; Ex. 3 at ¶ 6).

On February 6, 2008, DMP issued "Reissue #1" of Purchase Order No. 36631 to

Odom via facsimile sent to Odom's office in Ohio.  (Doc. 25, Ex. 2 at ¶ 14).  "Reissue

#1" of Purchase Order No. 36631 changed the delivery date for the 76" Semi-Head to

April 26, 2008, and clarified that Odom was not shipping the product.  (*Id.* at ¶ 15).

Odom successfully completed the fabrication of the 76" Semi-Head at its shop, and DMP,

or a shipping company of DMP, took possession of the 76" Semi-Head at Odom's shop in

Ohio for shipping.  (*Id.*, Ex. 2 at ¶ 16; Ex. 4).  DMP issued two checks to Odom for this

project and sent them to Odom's office in Ohio.  (*Id.*, Ex. 2 at ¶ 17).

**B.**	**DMP's Continued Solicitation Of Odom And Issuance Of Purchase Order # 36921**

Shortly after DMP initiated contact with Odom with respect to the project which

resulted in DMP issuing Purchase Order #36631, DMP again reached out to solicit a

quote from Odom for another project.  DMP requested that Odom submit a quote for the

fabrication of one Semi-Head with a 78" internal diameter.  (Doc. 25, Ex. 2 at ¶ 18).

Odom's sales representative again had several discussions with DMP representatives

regarding the 78" Semi-Head project, including negotiations over the terms upon which

Odom would complete the work.  (*Id.* at ¶ 19).

On February 6, 2008, Odom submitted a proposal for the 78" Semi-Head in

accordance with DMP's request.  Odom's proposal provided that it would fabricate the

Semi-Head, but excluded shipping and instead placed responsibility for shipping the 78"

Semi-Head from Milford, Ohio, upon DMP.  (Doc. 25, Ex. 2 at ¶ 20).  On February 8,

2008, DMP issued Purchase Order No. 36921 via facsimile to Odom's office in Ohio,

which contained DMP's proposed terms of its contractual arrangement with Odom for the

project.  The amount of the Purchase Order was $16,950.  (*Id*. at ¶ 21).  Odom thereafter

accepted DMP's Purchase Order.  (*Id.* at ¶ 22).

Purchase Order No. 36921 also created continuing obligations between the parties

with provisions affecting Ohio.  It required Odom to custom fabricate the 78" Semi-Head

in its shop located in Milford, Ohio over the following three months so that it was

complete and ready to ship by May 2, 2008.  In exchange, DMP was obligated to pay

Odom the Purchase Order price in two separate payments.  (Doc. 25, Ex. 2 at ¶ 23).

Odom was not responsible for shipping per the terms of Purchase Order which

instead provided that DMP (or an agent or vendor of DMP) was responsible for traveling

to Odom's shop in Ohio to pick-up the completed 78" Semi-Head and ship it from Ohio

to its final destination.  (Doc. 25, Ex. 2 at ¶ 24).  Odom successfully completed the

fabrication of the 78" Semi-Head at its shop, and DMP, or a shipping company of DMP,

took possession of the 78" Semi- Head at Odom's shop in Ohio for shipping.  (*Id.* at ¶

25).  DMP issued checks to Odom for this project and sent them to Odom's office in

Ohio.  (*Id*. at ¶ 26).

**C.    DMP's Continued Solicitation Of Odom For Quotes And Revised
Quotes, And Issuance Of A Letter Of Intent And Then Purchase Order
# 42958 To Odom (The Project At Issue In This Litigation)**

In approximately November 2008, DMP again reached out to Odom to solicit a

quote for yet another project.  DMP requested that Odom submit a quote for the

fabrication of a 2:1 ellipsoidal vessel head, and inquired whether Odom could roll an

additional thick steel cylinder.  (Doc. 25, Ex. 2 at ¶ 27).

For a two year period, from November 2008 to November 2010, DMP reached out

to Odom multiple times and requested additional information, and multiple revised quotes

from Odom with different variations, terms, and requirements for this project.  (Doc. 25,

Ex. 2 at ¶¶ 28, 29).  Odom submitted at least four quotes/revised quotes to DMP pursuant

to DMP's requests over the two-year period.  (*Id.*, Ex. 2 at ¶ 30; Ex. 3 at ¶ 8).  Over this

period, there were countless communications between DMP and Odom concerning the

proposed project.  (*Id.*, Ex. 2 at ¶ 31).

On November 10, 2010, DMP issued a letter of intent to Odom for the fabrication

of 2 semi-ellipsoidal heads (the "Heads" or "the Project").  (Doc. 25, Ex. 2 at ¶ 32; Ex. 3

at ¶ 9).  Thereafter, on November 19, 2010, DMP issued Purchase Order No. 42958 via

facsimile to Odom's office in Ohio, which contained DMP's proposed terms of its

contractual arrangement with Odom for the fabrication of the Semi-Ellipsoidal Heads.

The amount of the Purchase Order was $208,376.  (*Id.*, Ex. 2 at ¶ 33; Ex. 3 at ¶ 10).

Odom thereafter accepted DMP's Purchase Order.  (*Id.* at ¶ 34; *Id.* at ¶ 11).

The Purchase Order created continuing obligations between the parties with

provisions affecting Ohio.  It required Odom to custom fabricate the Semi-Ellipsoidal

Heads in its shop located in Milford, Ohio over the following two months so that it was

complete and ready to ship by January 21, 2011.  In exchange, DMP was obligated to pay

Odom the Purchase Order price in three separate payments.  (Doc. 25, Ex. 2 at ¶ 35; Ex. 3

at ¶ 12).

     Odom fabricated the Semi-Ellipsoidal Heads at its shop in Ohio.  (Doc. 25, Ex. 2

at ¶ 36; Ex. 3 at ¶ 13).  The Heads were subject to the ASME Engineering Code for

pressure vessels.  (*Id*., Ex. 3 at ¶ 14).  Odom hired a third-party company, Defendant TISI,

whose office with whom Odom communicated is located in Cincinnati, Ohio, to conduct

Radiographic ("RT") Non-Destructive Examination ("NDE") and Testing of the Heads

required by the applicable ASME Code at Odom's shop in Milford, Ohio, prior to

shipment of the Heads to DMP.  TISI conducted this examination and testing at Odom's

shop prior to shipment of the Heads to DMP, and found that the Heads were acceptable

under the Code.  (*Id.*, Ex. 2 at ¶ 37; Ex. 3 at ¶¶ 15-20).  The Heads were then shipped to

and accepted by DMP.  (*Id.*, Ex. 3 at ¶ 21).

     DMP issued three checks to Odom for this project and sent them to Odom's office

in Ohio.  (Doc. 25, Ex. 2 at ¶ 38; Ex. 3 at ¶ 22).  A dispute thereafter arose between DMP

and Odom that is the subject of this lawsuit.

**D.    DMP Solicited Odom To Submit Quotes For At Least Five Other
Projects That Did Not Result In Purchase Orders/Contracts**

In addition to the contacts by DMP with Odom described above which resulted in

a letter of intent, three purchase orders, and a "reissued" purchase order being issued, DMP has reached out to Odom and solicited quotes from Odom for at least five other projects in the last four years which did not result in purchase orders being issued. (Doc. 25, Ex. 2 at ¶ 40).

In sum, since 2007, DMP has consistently and continuously initiated contact with Odom by reaching out to Odom in Ohio to solicit quotes and communicate regarding projects and proposed projects. (*Id.*, Ex. 2 at ¶ 41). The total value of the three contracts between DMP and Odom exceeds $250,000.

## II.    PROCEDURAL HISTORY

Months after the Semi-Ellipsoidal Heads were completed by Odom and accepted by DMP, DMP alleged that work completed by Odom at its shop in Ohio, and the testing and examination conducted by TISI at Odom's shop in Ohio, were defective and had caused it damages. (Doc. 25, Ex. 2 at ¶ 39; Ex. 3 at ¶ 23).

While the Project required Odom to form the Heads and perform welding along the seams of the Heads at its shop in Milford, Ohio, post-weld heat treatment ("PWHT") of the Heads was specifically excluded by Odom from its scope of work on the Project, and was to be completed by DMP after shipment of the Heads. (Doc. 25, Ex. 3 at ¶¶ 24, 28). PWHT is a process used to improve the properties of a welded vessel by, among other things, improving the metallurgical structure, increasing its strength, and relieving stress. However, PWHT carries many risks, including, but not limited to, cracking the welded seams and causing damage to the metal structure. (*Id.* at ¶¶ 26, 27).

As stated above, prior to shipping the fabricated Heads to DMP, and prior to any PWHT of the Heads, TISI had conducted its examination and testing of the Semi-Ellipsoidal Heads at Odom's shop, and found that all welds and repairs performed by Odom were acceptable after x-ray and indicated the same to Odom on the reader sheets it provided.

After shipment of the Heads to DMP, DMP hired another company to conduct PWHT on the Heads. (Doc. 25, Ex. 3 at ¶¶ 29-31). After it conducted PWHT on the Heads, and months after the Heads were completed by Odom and accepted by DMP, DMP alleged that work completed by Odom at its shop in Ohio, and the testing and examination conducted by TISI at Odom's shop in Ohio, were defective. (*Id*. at ¶ 32).

A dispute arose between DMP and Odom as to when the cracks occurred, the cause of the cracks, Odom's completion of the Project in compliance with the contract between the parties, and responsibility for the costs DMP claims it incurred in repairing the Heads. (Doc. 25, Ex. 3 at ¶¶ 33-37). Thereafter, DMP requested that Odom send DMP the original x-ray films taken by TISI of the Heads. The x-rays are Odom's property, are necessary documents needed to prove its compliance with ASME code not only to DMP but to the ASME Board itself, and are key evidence in this dispute. Odom was very reluctant to send the x-rays to DMP because of their critical value in these several respects. Ultimately DMP reassured and represented to Odom that it would ensure protection of the x-rays, and promptly return them after its review, which it represented would take only a short time. (*Id.* at ¶ 38).

On October 20, 2011, DMP sent an email and letter agreement to Odom in Ohio, requesting that Odom mail its x-ray film to DMP and representing that "DMP understands and accepts the requirement that the film must be returned to Odom Industries upon completion of our review as soon as practical" and to protect and care for the film while in its possession.

Based upon these representations, Odom sent DMP its x-rays.  However, as of July 27, 2012, more than nine months after sending the x-rays to DMP and despite numerous requests for their return, DMP has failed to return the x-rays to Odom and instead has converted Odom's property and the key evidence which supports Odom's position in this dispute with DMP and TEAM.  (Doc. 25, Ex. 3 at ¶¶ 39-44).  Odom alleges that DMP's actions have been fraudulent and in bad faith.  (*Id*. at ¶ 44).  DMP in fact admits that it has not returned the x-rays.  (*Id.*, Ex. B).

Despite numerous communications about resolving this dispute over several months, the parties were unable able to move closer to a resolution of this dispute.  (Doc. 25, Ex. 3 at ¶¶ 45-51).  As a result, on March 16, 2012, Odom filed suit against DMP and TISI in the Common Pleas Court of Clermont County, Ohio.  Odom thereafter filed an Amended Complaint, and Defendants DMP and TISI removed the action to this Court.  (*See* Doc. 3).  Odom asserted the following claims against DMP: conversion; intentional and negligent misrepresentation; and declaratory judgment with respect to the contract

between Odom and DMP.  (*Id.*)  Odom also asserted alternative claims against TISI.[3]

In its Amended Complaint, Odom maintains that this Court has personal jurisdiction over DMP for the following reasons:

> Venue is proper in this Court, and personal jurisdiction may properly be asserted over Defendants, because, among other things: . . . Defendants transact business in the State of Ohio and in this county; the intentional tortious injury complained of herein occurred in this county; Defendants caused tortious injury in this State and county by its acts which were committed with the purpose of injuring Odom, which it reasonably should have expected would cause injury to Odom in this State; and Defendants caused tortious injury in this State and regularly do or solicit business, engage in other courses of conduct, and/or derive substantial revenue from goods or services rendered in this State.

(Doc. 3 at ¶ 4).

Following DMP's filing of its Motion to Dismiss, the parties engaged in limited paper discovery on the issue of personal jurisdiction.  In response to that discovery, DMP produced nearly 3,000 pages of documents relating to business it has transacted and contacts it has had with Ohio companies.[4]  (Doc. 25, Ex. 4 at 8).  This discovery reveals that, in addition to the repeated and continuous contacts DMP had with Odom discussed

---

[3]  After being served with Odom's Complaint, DMP initiated a second action against Odom relating to the same subject matter in an Idaho state court, which Odom subsequently removed to the District Court of Idaho.  In response to DMP's second filed action, Odom filed a motion to dismiss or stay the action based upon the first-to-file rule.  On July 12, 2012 Odom's motion was granted and the Idaho District Court has stayed the second-filed action pending resolution of DMP's motion to dismiss here. (Doc. 25, Ex. 1).  *See also Diversified Metal Products, Inc. v. Odom Industries, Inc.*, Case No. 1:12cv162 (D. Idaho).

[4]  Odom sought the assistance of the Magistrate Judge when DMP refused to properly and completely respond to its discovery requests.  (*See* Doc. 20).

above (which resulted in three contracts totaling more than $250,000), DMP has entered into more than 300 transactions with a value of more than $1.4 million with more than twenty-five other companies located in Ohio over the last five years.  (Doc. 25, Ex. 4). These transactions are at the core of DMP's business, ranging from purchases of material and parts to custom forming orders to industry certifications and documentation.  (*Id.*)  In addition, DMP has communicated with eleven Ohio companies regarding numerous proposed business transactions which were not consummated.  (*Id.*)  DMP employees have traveled to Ohio at least two times in the last three years to purchases items from Ohio vendors.  (*Id.*)  In fact, DMP has admitted that it promotes itself as a national company.  It states on its website that it has "grown to service a national base of customers in the government and nuclear markets," and its website includes a link to an article which states "Diversified Metal Products has contracts for work all over the United States."  (*Id.*)

### III.    STANDARD OF REVIEW

#### A.    Motion to Dismiss

Defendant DMP moves to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).  Plaintiff bears the burden of establishing this Court's personal jurisdiction over Defendants.  *Mich. Nat'l Bank v. Quality Dinette, Inc.*, 888 F.2d 462, 466 (6th Cir. 1989).  This burden, however, is "slight."  *Coast to Coast Health Care Services, Inc. v. Meyerhoffer*, 2:10cv734, 2012 U.S. Dist. LEXIS 6250, at *3 (S.D. Ohio

Jan. 19, 2012). In deciding whether personal jurisdiction exists, a court has discretion to hold a hearing or rely on the affidavits and factual allegations in the pleadings. *Id.*

When a defendant files a properly supported motion to dismiss, "the plaintiff may not stand on [its] pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). The plaintiff "need only make a *prima facie* showing of jurisdiction," and the court "does not weigh the [defendant's] controverting assertions." *Id.* Dismissal is proper where the plaintiff's factual allegations taken together fail to establish a *prima facie* case for personal jurisdiction. *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996).[5]

### B.   Motion to Transfer Venue

"For the convenience of the parties and witnesses, in the interest of justice, a

_____

[5] DMP argues that an exception to the *prima facie* standard exists and should be applied here because, although no evidentiary hearing has been held, Odom received discovery from DMP and "no real dispute exists" as to the facts. (Doc. 28 at 6). *See also Dean v. Motel 6 Operating*, 134 F.3d 1269, 1272 (6th Cir. 1998). However, in *Schneider v. Hardesty*, 669 F.3d 693 (6th Cir. 2012), the Sixth Circuit's most recent discussion of *Dean*, the Court expressed doubt about whether such an exception exists, and noted that it could not find any case in which the preponderance of the evidence standard had been applied when no evidentiary hearing had been held. *Id.* at 697-99. Regardless, the exception in *Dean* "was aimed at those rare instances in which a plaintiff had been granted all discovery requested and that discovery resulted in an undisputed set of facts such that an evidentiary hearing would be pointless." *Id.* at 699. However, facts pertinent to the jurisdictional inquiry here remain in dispute. For example, the parties dispute whether DMP transacts business in Ohio, whether DMP solicited Odom in Ohio, where the contract at issue was formed, where the work that caused the alleged defects in the project was performed, and whether Odom suffered injury/damages in Ohio. (Compare Docs. 6, 25, 28). Moreover, Plaintiff only conducted limited discovery. Accordingly, the *prima facie* standard applies, and the pleadings and affidavits must be considered in the light most favorable to Plaintiff.

-13-

district court may transfer any civil action to any other district court where it might have been brought." 28 U.S.C. § 1404.  Courts interpreting Section 1404(a) must engage in a two-step analysis and determine: (1) whether the action might have been brought in the proposed transferee court; and (2) whether considering all relevant factors, the balance of convenience and the interest of justice "strongly" favor transfer.  *Kay v. Nat'l City Mortg. Co.*, 494 F. Supp. 2d 845, 849-50 (S.D. Ohio 2007).  The moving party bears the burden of demonstrating that transfer under Section 1404 is proper.  *Id*.  District courts have discretion to adjudicate motions for transfer under Section 1404(a) "according to an 'individualized, case-by-case consideration of convenience and fairness.'"  *Stewart Org., Inc. v. Ricoh Corp*., 487 U.S. 22, 29 (1988).

## IV.  ANALYSIS

### A.    Motions to Strike

Odom submitted affidavits and evidence to demonstrate that DMP regularly transacts and solicits business in Ohio, and that its contacts with Ohio have been continuous and systemic.  (*See* Doc. 25, Exs. 2-3).  Now, Defendant DMP moves to strike the affidavits.

A party moving to strike an affidavit cannot rely upon broad allegations of inadmissibility.  *Lee v. City of Columbus*, 644 F.Supp.2d 1000, 1006 (S.D. Ohio 2009). The motion must specifically identify the statements which the movant contends are inadmissible and set forth specific reasons for each statement's alleged inadmissibility. *Id*.  "The burden is not on the court to review an affidavit to identify the specific

-14-

statements that should be stricken; this is the responsibility of the defendants." *Id.*
General assertions that an affidavit contains inadmissible statements is insufficient to
strike an entire affidavit. *Kaylor v. Holsinger*, 437 B.R. 260, 267 (S.D. Ohio 2010).
Further, in resolving a motion to strike an affidavit, a court should "use a scalpel, not a
butcher knife." *Id.*

### 1.    *W. Kelly Lundrigan*

Defendant DMP filed a motion to strike the affidavit of W. Kelly Lundrigan, Chief
Compliance Officer at Odom, because: (1) the affidavit is not based upon personal
knowledge; (2) the affidavit contains insufficient foundation for the matters set forth
therein; and (3) the statements set forth in the affidavit contain inadmissible hearsay.
(Doc. 30 at 1).  Specifically, DMP maintains that Mr. Lundrigan offers no foundation for
the statements set forth in his affidavit and that "[his] personal knowledge of the facts
herein is obtained in part from [a] review of Odom's business records."  (Doc. 25, Ex. 3
at ¶ 1).  To the extent that the affidavit is not based upon his personal knowledge, DMP
claims it should be stricken.  *See* Fed. R. Civ. P. 602 ("A witness may testify to a matter
only if evidence is introduced sufficient to support a finding that the witness has personal
knowledge of the matter.").

Here, however, Mr. Lundrigan has personal knowledge of the statements contained
in his affidavit from his participation in the actions described and from his review of the
company's business records.

I am the Chief Compliance Officer at Odom Industries, Inc., and my

-15-

personal knowledge of the facts herein is obtained in part from my review of Odom's business records, of which I do maintain or maintained custody at relevant times, kept by Odom as party of the normal course of its business practice and regularly conducted business activities.  These records are made at or near the time by, or from the information transmitted by an employee of Odom with personal knowledge of the information recorded in the business records, and I am familiar with Odom's method and procedures for generating, storing and organizing the records and documents generated at all times relevant to this lawsuit.

(Doc. 25, Ex. 3 at ¶ 1).

Contrary to Defendant's argument, Mr. Lundrigan's personal knowledge may be derived from his review of business records.  It is well-settled that personal knowledge "is not strictly limited to activities in which the declarant has personally participated." *AT&T Corp. v. Overdrive, Inc.*, No. 1:05cv1904, 2006 U.S. Dist. LEXIS 84836, at *6-7 (N.D. Ohio Nov. 21, 2006).  "Personal knowledge can come from review of the contents of business records, and an affiant may testify to acts that she did not personally observe but which are described in business records." *Id.*  Additionally, the Sixth Circuit recognizes that corporate officers are presumed to have personal knowledge of the acts of their corporations and may set forth those facts in an affidavit. *Findlay Indus. v. Bohanon*, No. 3:07cv1210, 2007 U.S. Dist. LEXIS 85154, at *9-10 (N.D. Ohio Aug. 14, 2007) (corporate officer's affidavit was proper because a corporate officer is considered to have personal knowledge of the acts of the company).

The Court finds that Mr. Lundrigan has personal knowledge of the statements contained in his affidavit and a proper foundation has been laid for the statements.  Many

-16-

of the statements contained in his affidavit are based upon his personal experience and observations, as is evident from the statements contained in the affidavit and the context of those statements, and the documents authenticated and attached to it.  Additionally, as an officer of the company. Mr. Lundrigan is permitted to set forth the company's legal position in his affidavit.  *See, e.g., Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp. 2d 814, 822 (S.D. Ohio Feb. 20, 2004).

Accordingly, Defendant DMP's motion to strike the affidavit of W. Kelly Lundrigan (Doc. 30) is **DENIED**.

### 2. *Frank McNeill*

Defendant also filed a motion to strike certain paragraphs in the Affidavit of Frank McNeill because they contain conclusory statements of law which are not supported by facts based upon personal knowledge.  (Doc. 31 at 1).

As explained in the Affidavit, Mr. McNeill has been personally involved in every transaction and virtually every communication and contact between Odom and DMP since the inception of their relationship in 2007, or has personally observed the activities described in the affidavit.  Mr. McNeill has been employed in the sales department of Odom since June 2006, more than a year prior to DMP's initial contact with Odom, and his office is located at Odom's office in Milford, Ohio, allowing him to personally observe the activities and work at Odom's facility.  *Id.*[6]  Therefore, the Court finds that

---

[6] Even if Mr. McNeill's statements were stricken, they are properly set forth in Mr. Lundrigan's affidavit and vice versa.

Mr. McNeill has personal knowledge of the statements contained in his affidavit.

Accordingly, Defendant DMP's motion to strike Frank McNeill's affidavit (Doc. 31) is **DENIED**.

**B.      Motion to Dismiss**

The Court's jurisdiction is founded on diversity; therefore a two-step process is used to determine whether this Court has personal jurisdiction over DMP, a nonresident. *Capitol Specialty Ins. Corp. v. Splash Dogs*, 801 F.Supp.2d 657, 663 (S.D. Ohio 2011). The Court must first decide whether DMP's conduct comes within the actions set forth in the Ohio long-arm statute and, if so, the Court must determine that exercising personal jurisdiction over DMP does not violate its Fourteenth Amendment due process rights.  *Id.* (quoting *Tharo Sys., Inc. v. Cab Produkttechnik GmbH & Co. KG*, 196 Fed. Appx. 366, 369 (6th Cir. 2006)).  The plaintiff's burden is "relatively light," and a court need only find that the plaintiff has set forth facts that support a finding of jurisdiction.  *Cent. Life Ins. Co. v. Andraos Capital Mgmt. & Ins. Servs.*, No. 09-758, 2010 U.S. Dist. LEXIS 129524, at *4-5 (S.D. Ohio June 16, 2010).

**1.      Long-arm statute**

Where, as in this case, "a federal court's subject matter jurisdiction over a case stems from the existence of a federal question, personal jurisdiction over a defendant exists 'if the defendant is amenable to service of process under the [forum] state's long-arm statute and if the exercise of personal jurisdiction would not deny the defendant[] due

process." *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002).

Ohio's long-arm statue provides in relevant part:

(A)     A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:
(1)     Transacting any business in this state; . . .

(4)     Causing tortious injury in this state by an act or omission outside this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state; . . .

(6)     Causing tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when he might reasonably have expected that some person would be injured thereby in this state. . .

Ohio Rev. Code § 2307.382(A)(1), (4), (6). "Although the Ohio Supreme Court has determined the Ohio long-arm statute does not extend to the constitutional limits of the Due Process Clause, [the] central inquiry is whether minimum contacts are satisfied so as not to offend 'traditional notions of fair play and substantial justice.'" *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000). "Jurisdiction may be found to exist either generally, in cases in which a defendant's 'continuous and systematic' conduct within the forum state renders the defendant amenable to suit in any lawsuit brought against it in the forum state, or specifically, in cases in which the subject matter of the lawsuit arises out of or is related to the defendant's contacts with the forum." *Estate of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 361 (6th Cir. 2008).

Odom alleges causes of action against DMP for conversion, intentional misrepresentation, negligent misrepresentation, and declaratory judgment of a contract.  It alleges personal jurisdiction is proper because:

> Defendants transact business in the State of Ohio and this county; . . . Defendants caused tortious injury in this State and county by its acts which were committed with the purpose of injuring Odom, which it reasonably should have expected would cause injury to Odom in this State; and Defendants caused tortious injury in this State and regularly do or solicit business, engage in other courses of conduct, and/or derive substantial revenue from goods or services rendered in this State.

(Doc. 3 at ¶ 6).

Conversely, DMP maintains that its conduct does not bring it within the scope of Ohio's long-arm statute, and even if it did, DMP does not have sufficient minimum contacts with Ohio to support a finding of personal jurisdiction without violating its due process interests.

### a.  Business Transactions in Ohio

The Ohio Supreme Court has explained that § 2307.382(A)(1) "is very broadly worded and permit[s] jurisdiction over nonresident defendants who are transacting any business in Ohio." *Kentucky Oaks Mall Co. v. Michell's Formal Wear, Inc.*, 559 N.E.2d 477, 481 (Ohio 1990).  *See also Brunner v. Hampson*, 441 F.3d 457, 464 (6th Cir. 2006) ("[t]he term 'transacting any business' as used in . . . the statute . . . will be given broad interpretation.").

The Courts have identified two factors that help determine whether an out-of-state defendant "transacted business" within the meaning of the long-arm statute. *Hitachi Med. Sys. Am., Inc. v. St. Louis Gynecology & Oncology, LLC*, No. 5:09cv2613, 2011 U.S. Dist. LEXIS 17022, at *12 (N.D. Ohio Feb. 22, 2011). "The first factor is whether the out-of-state defendant initiated the dealing. If it were the defendant who 'reached out' to the forum state to create a business relationship, the defendant has transacted business within the forum state. The question of who initiates the contact, however, is but one factor to be considered and the determination is not always dependent upon who initiates the contact." *Id.* at 12-13.

"The second factor is 'whether the parties conducted their negotiations or discussions in the forum state, or with terms affecting the forum sate.' If the parties negotiated in Ohio with provisions affecting Ohio, the non-resident transacted business in Ohio. However, merely directing communications to an Ohio resident for the purpose of negotiating an agreement, without more, is insufficient to constitute 'transacting business.' 'Rather, there must additionally be some continuing obligation that connects the non-resident defendant to the state or some terms of the agreement that affect the state.'" *Hitachi*, 2011 U.S. Dist. LEXIS 17022 at 14-15. When "a nonresident defendant transacts business by negotiating and executing a contract via telephone calls and letters to an Ohio resident, then the defendant has purposefully availed himself of the forum by creating a continuing obligation in Ohio." *Russian Collections v. Melamid*, No.

-21-

2:09cv300, 2009 U.S. Dist. LEXIS 113733, at *13-14 (S.D. Ohio Nov. 18, 2009).

In the instant case, Plaintiff alleges that DMP initially reached into Ohio and initiated contact with it to solicit a quote and then continued to reach into Ohio to solicit quotes for additional projects.  (Doc. 25, Ex. 2 at ¶ 3).  Since 2007, DMP has contacted Odom in Ohio and requested that it provide quotes and revised quotes for at least eight projects.  Three of these projects resulted in DMP issuing Purchase Orders to Odom in Ohio (one of which is at issue in this litigation).  (*Id*., Ex. 2 at ¶¶ 4, 5; Ex. 3 at ¶¶ 4, 5).

With respect to the particular transaction at issue in this litigation (the Semi-Ellipsoidal Heads), it was allegedly DMP who reached out to Odom to solicit a quote for the Project.  (Doc. 25, Ex. 2 at ¶ 27).  The terms of the contract were negotiated through communications by DMP with Odom in Ohio, and for a two year period (from November 2008-November 2010) DMP reached out to Odom multiple times and requested additional information and multiple revised quotes with different variations, terms, and requirements for the project.  (*Id*. at ¶¶ 28, 29).

DMP then issued a letter of intent to Odom in Ohio for the fabrication of the Heads, and subsequently issued Purchase Order No. 42958 via facsimile to Odom's office in Ohio.  (Doc. 25, Ex. 2 at ¶ 32; Ex. 3 at ¶ 9).  The Purchase Order created continuing obligations between the parties with provisions affecting Ohio.  This was a custom forming job that required Odom to fabricate the Semi-Ellipsoidal Heads in its shop located in Milford, Ohio over the following two months so that it was complete and ready to ship by January 21, 2011.  In exchange, DMP was obligated to pay Odom the Purchase

Order price in three separate payments.  (*Id.*, Ex. 2 at ¶ 35; Ex. 3 at ¶ 12).

Odom fabricated the Semi-Ellipsoidal Heads at its shop in Ohio and hired TISI to conduct the testing of the Heads required by the ASME Code at Odom's shop in Ohio. (Doc. 25, Ex. 2 at ¶ 37; Ex. 3 at ¶¶ 15-20).  DMP issued three checks to Odom for this project and sent them to Odom's office in Ohio.  (Doc. 25, Ex. 2 at ¶ 38; Ex. 3 at ¶ 22). This lawsuit arose from these contacts with DMP, because DMP contends that the work completed by Odom at its shop in Ohio, and the testing and examination conducted by TEAM at Odom's shop in Ohio were defective and has caused it damages.  (*Id.*, Ex. 2 at ¶ 28; Ex. 3 at ¶ 23).[7]

In sum, DMP initiated contact regarding multiple proposed and consummated business transactions with Odom in Ohio and has contacted and entered into hundreds of other business transactions with Ohio companies.  Specifically: (1) DMP initiated contact with Odom for the Project at issue in this litigation; (2) DMP contacted Odom multiple times over a 2 year period regarding the Project and conducted negotiations with Odom concerning the same; and (3) DMP issued a letter of intent and purchase order to Odom in Ohio for the custom forming project.  These alleged actions by DMP created continuing obligations between the companies.  Courts have found personal jurisdiction pursuant to section (A)(1) in a variety of circumstances where the defendant's contacts with Ohio

---

[7] Defendant DMP maintains that it sent a single Purchase Order to Odom agreeing to purchase Heads.  (Doc. 6, Ex. 2 at ¶ 5).  Additionally, DMP argues that none of its representatives even traveled to Ohio, but that Odom delivered the Heads to Idaho, and Odom's President, Tim Odom, traveled to Idaho to stamp the Heads.  (*Id.* at ¶¶ 5, 7, 8).

were much less substantial than in the instant case.  *See, e.g., Ky. Oaks Mall Co. v. Mitchell's Formal Wear*, 559 N.E.2d 477, 479-480 (Ohio 1990) (commercial non-resident defendant transacted business on Ohio where it negotiated with an Ohio business, and through the course of dealing, because it was obligated to make payments to its lessor in Ohio, even though it maintained no physical presence in Ohio).

Accordingly, Plaintiff has alleged sufficient facts to find that personal jurisdiction is proper pursuant to Ohio Rev. Code § 2307.382(A)(1).

### b.    Tortious Injury in Ohio

Plaintiff asserted claims against DMP for conversion and intentional and negligent misrepresentation.  Specifically, Plaintiff alleges that DMP fraudulently induced it to release its x-rays and then converted them.  The x-rays are Odom's property, are necessary documents needed to prove its compliance with the ADME code, not only to DMP but to the ADME Board itself, are required to be kept as part of Odom's records by the ASME code itself, and are key evidence in this dispute.  Odom was reluctant to send the x-rays to DMP because of their critical value in these respects, but DMP reassured and represented that it would ensure protection of the x-rays and promptly return them after review.  (Doc. 25, Ex. 3 at ¶ 38).  However, Plaintiff alleges that DMP has failed to return the x-rays and instead has converted the property and key evidence.  (*Id.* at ¶ 39-44).  As a result, DMP's misrepresentations concerning its intentions regarding Odom's x-rays, and its conversion of the x-rays has caused Odom to suffer injury at its location in

-24-

Ohio. (*Id.* at ¶ 50). Despite the fact that the x-rays were sent to Idaho and DMP has

allegedly refused to return them from Idaho, the alleged fraudulent scheme to induce

Odom (in Ohio) to send x-rays (located in Ohio) for DMP to inspect in Idaho by

fraudulently misrepresenting to Odom (in Ohio) that it would return the x-rays to Odom

in Ohio, is sufficient to allege that the injury occurred in Ohio.[8]

    "Subsection (A)(6) applies when an out-of-state defendant, acting directly or

through an agent, causes a tortious injury in Ohio by an act committed outside the state,

provided that (1) the out-of-state act was committed with the purpose of inflicting an

injury and (2) the injury was reasonably expected to occur." *Coleman v. Parra*, 163 F.

Supp.2d 876, 889 (S.D. Ohio 2000). Courts interpreting Ohio Rev. Code § 2307.382

(A)(6) have generally "taken a broad approach" to its application. *Schneider v. Hardesty*,

669 F.3d 693, 700 (6th Cir. 2012). "Of particular note, district courts have found that

---

    [8] Defendant DMP maintains that there is no evidence indicating that its communications were fraudulent. (Doc. 28 at 13). Moreover, DMP argues that it was within its contractual rights under the Purchase Order to request and perform an inspection of the x-rays and that it repeatedly notified Odom of its intent to return them after finding a suitable vendor to copy the x-rays. (Doc. 6, Ex. 2 at ¶¶ 5-6; Ex. 1 at ¶ 16). As late as March 7, 2012, McMasters notified Lundrigan via email that DMP had secured a vendor to copy the x-rays and would provide Odom a lead time for their return. (*Id.*, Ex. 1 ¶ 16). Without any response, Odom filed this lawsuit within two weeks of receiving McMaster's email. (*Id.* at ¶¶ 16-18). Even if this Court finds that DMP's allegedly tortious conduct could have injured Odom in Ohio, DMP maintains that the communications between DMP and Odom show that DMP did not request the x-rays "with the purpose of injuring Odom." (Doc. 6 at 19). Additionally, Defendant DMP claims that Plaintiff cannot maintain conversion claims because Odom is contractually obligated to allow DMP to audit and inspect all documents. (Doc. 28 at 16). DMP clearly raises several disputed issues of fact. However, for purposes of the pending motion to dismiss, the Court "does not weigh the [defendant's] controverting assertions." *Theunissen*, 945 F.2d at 1458. The Court also notes that the x-rays appear to have been outstanding for nearly one year, which appears to be an excessive period of time to obtain x-ray copies.

fraudulent communications or misrepresentations directed at Ohio residents satisfy Section 2307.382(A)(6)'s requirements." *Id.  See, e.g., Highway Auto Sales, Inc. v. Auto-King of Scottsdale, Inc.*, 943 F.Supp. 825, 829 (N.D. Ohio 1996) (defendant-non-resident's alleged acts of negligent misrepresentation and fraud, communicated directly to the Ohio resident by the defendant, caused injury by omission in Ohio under Ohio Rev. Code § 2307.382(A)(6).

At this stage in the litigation it is unclear whether Defendant DMP committed acts of conversion or misrepresentation.  However, the Court must construe the facts in the light most favorable to the nonmoving party, and Plaintiff has alleged sufficient facts to maintain such claims and sufficient facts that it was injured in Ohio as a result. Accordingly, Plaintiff has alleged sufficient facts to find that personal jurisdiction is proper pursuant to Ohio Rev. Code § 2307.382(A)(6).

### 2. *Constitutional due process rights*

The Sixth Circuit employs a three-prong test to determine whether specific jurisdiction may be exercised consistent with the Due Process Clause of the Fourteenth Amendment.  First, "the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state." *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968).  Second, the cause of action must arise from the defendant's activities there." *Id.*  Finally, "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection to

the forum to make the exercise of jurisdiction over the defendant reasonable." *Id.*

### a.    Purposeful Availment

"The purposeful availment prong of the *Southern Machine* test is essential to a finding of personal jurisdiction." *Calphalon Corp. v. Rowletter*, 228 F.3d 718, 721 (6th Cir. 2000). It "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Id.* at 721-22. Purposeful availment is satisfied when, "the defendant's contacts with the forum state proximately result from actions by the defendant himself that create a substantial connection with the forum State, and when the defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into court there." *Bridgeport Music, Inc. v. Still N The Water Publ'g*, 327 F.2d 472, 478 (6th Cir. 2003). "The emphasis in the purposeful availment inquiry is whether the defendant has engaged in 'some overt actions connecting the defendant with the forum state.'" *Id.* "The Sixth Circuit has held that a single 'substantial business contract' can satisfy the requirements of purposeful availment." *Union Cent.*, 2010 U.S. Dist. LEXIS 129524 at 10-11.

"[T]he Ohio 'transacting any business' standard is coextensive with the purposeful availment prong of the constitutional analysis." *Burnshire Dev ., LLC v. Cliffs Reduced Iron Corp.*, 198 F. App'x 425, 432 (6th Cir. 2006). Accordingly, there is no need to do a separate purposeful-availment analysis here.

DMP purposefully availed itself of the privilege of conducting business in Ohio because it "transacted business in Ohio," thus satisfying the purposeful availment prong of the specific jurisdiction analysis.  *Russian Collections*, 2009 U.S. Dist. LEXIS 113733 at 13-14.  By negotiating and executing the contract with Odom through communications with Odom in Ohio, which created continuing obligations in Ohio, DMP has purposefully availed itself of the privilege of conducting business in Ohio.  *Id.*

**b.    Arising From**

The second prong of the test is that a plaintiff's cause of action must "arise from" the defendant's contacts with the forum state.  *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 553 (6th Cir. 2007).  This is a "lenient standard."  *Id.*  "If a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contacts."  *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1267 (6th Cir. 1996).  "This factor does not require that the cause of action formally arise from defendant's contacts with the forum; rather, this criterion requires only that the cause of action, of whatever type, have a substantial connection with the defendant's in-state activities."  *Bird*, 289 F.3d at 875.

This requirement is clearly met.  DMP's contacts with Odom and Ohio resulted in the contract at issue and DMP's representations to Odom in Ohio with respect to Odom's x-rays and conversion of the same are likewise at issue.

**c.    Reasonableness**

The third prong of the relevant test states that "the acts of the defendant or

-28-

consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Air Prods.*, 503 F.3d at 554.  In other words, whether exercising personal jurisdiction would "comport with traditional notions of fair play and substantial justice." *CompuServe, Inc.*, 89 F.3d at 1267-68.  Sixth Circuit precedent dictates that when applying this third prong, "where the first two criteria are satisfied, 'only the unusual case will not meet the third criterion.'" *Aristech Chem. Int'l Ltd. v. Acrylic Fabricators Ltd.*, 138 F.3d 624 (6th Cir. 1998).  "Whether the exercise of jurisdiction over a foreign defendant is reasonable is a function of balancing three factors: the burden on the defendant, the interest of the forum State, and the plaintiff's interest in obtaining relief." *City of Monroe Emps. Ret. Sys. v. Bridgestone*, 399 F.3d 651, 666 (6th Cir. 2005).  Courts must also weigh "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies." *Wold-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).

Here, the exercise of personal jurisdiction over DMP is reasonable and comports with notions of fair play and substantial justice.  A state's interest in resolving suits brought by its residents weighs in favor of a finding of personal jurisdiction. *Union Cent.*, 2010 U.S. Dist. LEXIS 129524 at 11-12.  Ohio has a strong interest in resolving suits brought by its residents and has a substantial interest in seeing that its residents get the benefit of their bargains. *Russian Collections*, 2009 U.S. Dist. LEXIS 113733.

Accordingly, the Court finds that Plaintiff has made a *prima facie* case for personal jurisdiction.[9]

### C.    Motion to Transfer Venue

In the alternative, DMP argues that the Court should transfer venue to the United States District Court for the District of Idaho pursuant to 28 U.S.C. § 1404, which provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district court where it might have been brought."  "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Reese v. CNH Am.*, 574 F.3d 315, 320 (6th Cir. 2009).  "The Court must give foremost consideration to the plaintiff's choice of forum and the balance must weigh strongly in favor of a transfer before the Court should grant a Section 1404(a) motion." *Western & Southern Life Ins. Co. v. Morgan Stanley Mortg. Capital, Inc.*, No. 1:11-cv-576, 2011 U.S. Dist. LEXIS 146213, at *11 (S.D. Ohio Dec. 20, 2011).[10]  "The moving party bears the burden of showing the need to transfer venue." *Jamhour v. Scottsdale Ins. Co.*, 211 F. Supp.2d 941, 945 (S.D. Ohio 2002).

---

[9]  At this stage in the litigation, the Court need not weigh Defendant's controverting assertions.  *Theunissen*, 935 F.2d at 458.

[10] "A plaintiff's choice of forum, however, is entitled to somewhat less weight when the case is removed to federal court because the plaintiff is no longer in his or her chosen forum, which was state court." *Jamhour v. Scottsdale Ins. Co.*, 211 F.Supp.2d 941, 944 (S.D. Ohio 2002). Here, Plaintiff initially filed suit in Ohio state court, and Defendants DMP and TISI removed to this Court.  (*See* Doc. 3).

### 1.    Could the lawsuit have been brought in Idaho

Following 28 U.S.C. § 1404(a), the Court must first determine if this matter could have been brought in Idaho.  To determine whether an action "might have been brought" in the transferee court, courts ask whether the transferee court has jurisdiction over the subject matter of the action, whether venue is proper there, and whether the defendant is amendable to process issuing out of the transferee court.  *Kay*, 494 F. Supp. 2d at 849. This Court may not transfer a case where personal jurisdiction over the defendants does not exist.  *Pittock v. Otis Elevator Co.*, 8 F.3d 325, 329 (6th Cir. 1993).

In order for an Idaho court to exercise jurisdiction over an out-of-state defendant, it must be established that: (1) the act giving rise to the cause of action falls within Idaho's long arm statute; and (2) the constitutional standards of due process are met. *Echevarria v. Piccolo*, No. 1:10cv642, 2012 U.S. Dist. LEXIS 19968, at *6 (D. Idaho Feb. 16, 2012).  In adopting Idaho's long arm statute, the legislature "intended to exercise all the jurisdiction available to the State of Idaho under the due process clause of the United States Constitution."  *Id.* at 7.

DMP argues that this case can be transferred to an Idaho court because it would have personal jurisdiction over both Odom and TISI.[11]  Specifically, DMP maintains that

---

[11]  "[P]ractically speaking, plaintiffs always concede personal jurisdiction, so the inquiry is typically restricted to defendants; because defendants who reside in the forum state will always be subject to the personal jurisdiction of the court, the injury is most further restricted to non-resident defendants."  *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012).  Because Odom is the plaintiff, it is unnecessary to determine whether it is subject to personal jurisdiction in Idaho.

because TISI is registered to do business as a foreign corporation with Idaho's Secretary

of State, it is subject to the jurisdiction of Idaho courts.[12]  However, TISI is not

incorporated in Idaho, has no offices or employees in Idaho, and is not currently

conducting business there.  (Doc. 24, Ex. 2 at ¶¶ 2-3).  Although TISI has, from time to

time, engaged in limited business in Idaho, such business is isolated and sporadic.  (*Id.* at

¶ 3).  *See, e.g., Wood v. Kinetic Systems*, No. 09cv579, 2010 U.S. Dist. LEXIS 21125, at

*10 (D. Idaho Mar. 9, 2010).[13]

TISI's contract was with an Ohio corporation, Odom, and was negotiated out of

TISI's Cincinnati, Ohio office.  TISI performed the x-rays at issue at Odom's Milford,

Ohio facility.  TISI never entered into a contract with DMP or any other resident of Idaho

in connection with the Heads.  TISI did send a team to Idaho to perform heat-treating on

the Heads, but only after the alleged issues with the Heads in this case were discovered,

and Odom makes no allegation that the TISI heat-treatment caused any of the alleged

damages at issue.  (Doc. 24, Ex. 2 at ¶¶ 4-6).

DMP argues that TISI purposefully availed itself of the privilege of conducting

---

[12]  It is undisputed that TISI has been registered to do business in Idaho as a foreign
corporation since February 9, 1990 and is currently in good standing with the Idaho Secretary of
State.  (Doc. 6, Ex. 4).  TISI also has a registered agent in Idaho.  (*Id.*)

[13]  *Id.* (The ability to perform work in Idaho by virtue of a Certificate of Authority, current
registration to transact business in Idaho, and an Idaho contractor's registration number [] does
not rise to the level of "substantial" or "continuous or systematic" activities in Idaho.  Merely
"engaging in commerce with residents of the forum state is not in and of itself the kind of activity
that approximates physical presence within the state's borders.").

activities in Idaho by registering as a foreign corporation and purposefully directed
activities at Idaho, by, among other things, performing post-weld heat treatment work in
Idaho.  (Doc. 6, Ex. 3 at ¶ 8).  However, the complaint focuses upon TISI's x-rays on the
cylinder heads in Ohio.  (Doc. 3 at ¶¶ 44-48).  TISI's heat-treatment activities in Idaho
post-date, and are unrelated to, the alleged conduct of TISI that Odom claims allegedly
caused it damages.  Additionally, Odom brought a declaratory judgment action against
TISI seeking a declaration that TISI is liable to Odom for any damages Odom is required
to pay DMP.  (Doc. 3 at ¶ 44).  TISI contends that Odom has not yet paid $70,000 owed
for the work TISI performed on the defective Head in Idaho costing $140,000.  (Doc. 24,
Ex. 2 at ¶ 6).  Indeed, TISI brought a counterclaim against Odom to recover that amount,
but it alleges that its work in Idaho was to rectify issues with the Head that Odom
contends were caused by TISI's improper inspection.  (Doc. 4 at ¶¶ 10-11).  There is
nothing in the record indicating that TISI performed this work under a separate contract
with Odom.  Therefore, DMP maintains that not only is TISI's work in Idaho material to
the dispute between Odom and DMP, but it also arises out of or relates to the dispute
between TISI and Odom.

Ultimately, the Court finds that whether an Idaho court would have personal
jurisdiction over TISI is a close call, but ultimately irrelevant to this Court's
determination.  Accordingly, the Court declines to make a finding in that respect.

**2.      *Should the lawsuit be transferred to Idaho***

Next, a court should "consider the private interests of the parties, including their

convenience and the convenience of potential witnesses, as well as other public-interest

concerns, such as systemic integrity and fairness, which come under the rubric of

'interests of justice.'" *Walnut Private Equity Fund v. Argi Tea, Inc.*, No. 1:11cv770,

2011 U.S. Dist. LEXIS 138884, at 35-36 (S.D. Ohio Dec. 2, 2011).  For a change of

venue to be appropriate, the balance of convenience must weigh heavily in favor of the

transfer because 28 U.S.C. § 1404(a) is not intended to shift an action to a forum likely to

prove equally convenient or inconvenient. *Van Dusen v. Barrack*, 376 U.S. 612, 645-46

(1964).

Private factors include: (i) the relative ease of access to sources of proof;

(ii) availability of compulsory process for attendance of unwilling, and the costs of

obtaining attendance of willing, witnesses; (iii) possibility of view of premises, if view

would be appropriate to the action; and (iv) all other practical problems that make trial of

a case easy, expeditious and inexpensive. *Argo Tea*, 2011 U.S. Dist. LEXIS 138884 at

36.  Public factors include: (i) court congestion; (ii) the local interest in having localized

controversies decided at home; (iii) the interest in having the trial of a diversity case in a

forum that is at home with the law that must govern the action; (iv) the avoidance of

unnecessary problems in conflict of laws, or in the application of foreign law; and (v) the

unfairness of burdening citizens in an unrelated forum with jury duty. *Id.*  Other factors

to consider include: (1) the nature of the suit; (2) the place of the events involved; (3) the relative ease of access to sources of proof; (4) the nature and materiality of testimony to be elicited from witnesses who must be transported; (5) the respective courts' familiarity with the applicable law and the conditions of their dockets; and (6) the residences of the parties. *Id.* at 36-37.

The most important factor in ruling upon a motion to transfer under 28 U.S.C. § 1404(a) is the convenience of witnesses. *Walnut Private Equity Fund v. Hauser Capital Partners*, No. 1:11cv770, 2011 U.S. Dist. LEXIS 138884, at *39 (S.D. Ohio Dec. 2, 2011). Odom claims that a majority of the witnesses are located in Ohio, including at least seven critical witnesses who have knowledge of the negotiations, contract, and work at issue, and the misrepresentations and conversion. (Doc. 25, Ex. 3 at ¶ 53). As to Plaintiff's alleged claims against TISI pertaining to the x-rays of the Heads, all of the operative facts occurred in Ohio, and all of the witnesses are in the Greater Cincinnati region.

Additionally, the ultimate end-user of DMP's vessel was Bechtel National, Inc., located in Richmond, Kentucky. Bechtel was involved in setting the manufacturing specifications of the vessel and apparently complained about DMP's manufacture of the vessel, so its Richmond-based representatives likely will be witnesses to the litigation. (Doc. 24, Exs 1-2).

-35-

DMP argues that it has identified no less than six employees of nonparties that are material witnesses to the post-weld heat treatment, inspections of the Head, and repair of the Head at Eaton Metal Products facility in Pocatello, Idaho. (Doc. 29 at 7). DMP maintains that the Eaton employees are vital in this lawsuit because Odom's case (and presumably TISI's) appears to rest on its contention that the defects were caused by the post-weld heat treatment at Eaton's facility in Pocatello, Idaho. (Doc. 3 at ¶¶ 15, 43).

While this Court finds that: (1) some witnesses are in Idaho; (2) DMP might be required to incur the costs of transporting them to Ohio; and (3) it might not be possible to compel some witnesses to appear before this Court at trial, these are the exact same problems Odom and TISI would have if this matter were transferred to Idaho; that is, by transferring this case to Idaho, DMP would simply be shifting the burden from itself onto Odom and TISI. Section 1404 "does not allow for transfer to a forum that is equally convenient or inconvenient, nor does it allow for transfer if that transfer would only shift the inconvenience from one party to another." *Brown v. Miami Mgmt. Co. Inc.*, No. 1:05cv535 2006 U.S. Dist. LEXIS 37624, at *5 (S.D. Ohio June 8, 2006). Additionally, many of the witnesses DMP would call at trial are either its own employees or employees of companies with which it does business. Therefore, DMP should not have a problem requiring these witnesses to appear at trial, and even if they were unable to appear, they are still subject to subpoena for video depositions in Idaho, which could

be used at trial.[14]  The Court declines to accord weight to the convenience of unidentified non-party witnesses DMP may call and who may not agree to attend trial in the Southern District of Ohio.

Next, DMP argues that its agreement with Odom would likely be governed by Idaho law, and that an Idaho court would be in the best position to apply the law.  Even if Idaho law does apply to the contract between Odom and DMP, the agreement between TISI and Odom is also in issue and there is no question that it is governed by Ohio law.[15] Therefore, if this matter were transferred, there is no question that the Idaho court would be required to decide issues of Ohio law.  Ultimately, the issue of what state's law applies is irrelevant to this Court's analysis – whether or not Idaho law applies does not make litigating in Idaho more convenient, nor does it affect the interest of justice analysis.

Finally, Ohio has a public interest in resolving this dispute since two of the three parties are residents of Ohio.  Ohio has a strong interest in resolving suits brought by its residents and has a substantial interest in seeing that its residents get the benefit of their bargains.  *Russian Collections*, 2009 U.S. Dist. LEXIS 113733.  Additionally, Ohio has a

---

[14]  *See, e.g., Armco, Inc. v. Reliance Nat. Ins. Co.*, No. C-1-96-1149, 1997 U.S. Dist. LEXIS 7880, at *5 (S.D. Ohio Mary 30, 1997) ("[T]he Defendant must submit evidence indicating that their witnesses would be unwilling to attend and offer testimony . . . [T]he Defendant must submit evidence indicating that their witnesses have refused to attend trial in the Southern District.").  DMP has made no such showing.

[15]  The contract between TISI and Odom provides that the law of the State of Ohio applies and contains a forum selection clause that requires legal matters to be filed in Clermont County, Ohio.  (Doc. 25, Ex. A at ¶ 21).  Therefore, this matter could not be resolved comprehensively among all parties in Ohio.

strong interest in cases where the defendant's tortious conduct has caused damages to an Ohio resident, as alleged here.  *High Tymes Prods. v. PRN Prods.*, No. 1-93-298, 1994 U.S. Dist. LEXIS 21315 (S.D. Ohio Feb. 9, 1994).

Upon review of all of the relevant factors, DMP has failed to meet its substantial burden and its request to transfer this action to Idaho is denied.

## V.    CONCLUSION

Accordingly, for the reasons stated herein:

1.    Defendant DMP's motion to dismiss or in the alternative to transfer venue (Doc. 6) is **DENIED**; and

2.    Defendant DMP's motions to strike (Docs. 30, 31) are **DENIED**.

**IT IS SO ORDERED.**

Date:  9/24/12                                      ___*s/ Timothy S. Black*___
                                                          Timothy S. Black
                                                          United States District Judge

-38-